**Stephen F. English**, OSB No. 730843
SEnglish@perkinscoie.com
**Julia E. Markley**, OSB No. 000791
JMarkley@perkinscoie.com
**Kristina J. Holm**, OSB No. 112607
KJHolm@perkinscoie.com
**PERKINS COIE LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Telephone:  503.727.2000
Facsimile:  503.727.2222

Attorneys for Defendants and Counterclaim Plaintiffs
CC International LLC and Hot Off The Press, Inc.

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| **TOO MARKER PRODUCTS, INC.**, and **IMAGINATION INTERNATIONAL, INC.**, <br><br>        Plaintiffs and Counterclaim Defendants, <br> v. <br><br> **CC INTERNATIONAL LLC, AND HOT OFF THE PRESS, INC.**, <br><br>        Defendants and Counterclaim Plaintiffs. | **Case No. 6:12-cv-00834-TC** <br><br> **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |

DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT

86860-0001/LEGAL24916038

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................. 1

II.   STATEMENT OF FACTS ................................................................... 3

   A.   The Spectrum Noir Markers ..................................................... 3

        1.   Crafter's Companion and Alcohol Markers in
             General ................................................................................ 3

        2.   The Old Spectrum Noir Markers ....................................... 4

        3.   The Current Spectrum Noir Markers ................................. 5

   B.   The Copic Markers ..................................................................... 8

   C.   Other Alcohol Based Markers Available in the United
        States ......................................................................................... 11

        1.   The Shinhan Touch Markers ............................................. 11

             a.   The Old Shinhan Touch Marker ............................. 11

             b.   The Current Shinhan Touch Markers ...................... 12

        2.   The Kurecolor Markers ...................................................... 14

        3.   The Pantone Markers ......................................................... 16

        4.   The MEPXY Markers ........................................................ 17

III.   LEGAL STANDARDS ....................................................................... 17

   A.   The Law of Trademark Infringement and Unfair
        Competition ............................................................................... 18

        1.   Significant Dissimilarity of Product Configuration
             Marks as They Appear in the Marketplace Can
             Establish Lack of Likelihood of Confusion ..................... 18

        2.   Functional and Nondistinctive Product
             Configurations Are Not Protectable Under
             Trademark and Unfair Competition Law .......................... 19

   B.   To Avoid Summary Dismissal of Trademark Infringement
        and Unfair Competition Claims, a Plaintiff Must Show a
        Probable Likelihood of Confusion ............................................. 20

IV.   ANALYSIS .......................................................................................... 21

i   DEFENDANTS' MEMORANDUM IN SUPPORT OF
    MOTION FOR PARTIAL SUMMARY JUDGMENT

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

86860-0001/LEGAL24916038

# TABLE OF CONTENTS
### (continued)

Page

A.  The Sleekcraft Factors Favor Dismissal of the Copic
    Plaintiffs' Trademark Infringement and Unfair Competition
    Claims .................................................................................................. 21

    1.  Dissimilarity of the Marks:  The Parties' Respective
        Markers Differ Dramatically, and This Factor
        Weighs Heavily Against a Likelihood of Confusion .............................. 22

    2.  The Weakness of the Marks:  The Weakness of the
        Copic Marks Weigh Against a Likelihood of
        Confusion .......................................................................................... 26

    3.  No Evidence of Actual Confusion:  This Factor
        Weighs Against a Likelihood of Confusion ............................................ 29

    4.  High Degree of Care Exercised by Purchasers:  This
        Factor Weighs Against a Likelihood of Confusion ................................. 30

        a.  Professional retail purchasers exercise a
            high degree of care .................................................................... 30

        b.  End consumers also exercise a high degree
            of care because of the significant difference
            in price and are unlikely to be confused ..................................... 30

    5.  No Intent to Deceive:  This Factor Weighs Against
        a Likelihood of Confusion ................................................................... 31

V.  CONCLUSION .............................................................................................. 32

DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

86860-0001/LEGAL24916038

# TABLE OF AUTHORITIES

Page(s)

## Cases

*AMF Inc. v. Sleekcraft Boats,*
 599 F.2d 341 (9th Cir. 1979) ................................................................. passim

*Aurora World, Inc. v. Ty Inc.,*
 719 F. Supp. 2d 1115 (C.D. Cal. 2009) ................................................... 31

*Bristol-Myers Squibb Co. v. McNeil -P.P.C., Inc.,*
 973 F.2d 1033 (2d Cir. 1992) ................................................................. 23

*Brookfield Commc'ns, Inc. v. West Coast Entm't, Corp.,*
 174 F.3d 1036 (9th Cir. 1999) ............................................... 2, 19, 21, 24

*Celotex Corp. v. Catrett,*
 477 U.S. 317 (1986)................................................................................ 20

*Cohn v. Petsmart, Inc.,*
 281 F.3d 837 (9th Cir. 2002) ............................................................ 21, 29

*E&J Gallo v. Proximo Spirits, Inc.,*
 No. CV-F-10-411, 2012 WL 273076 (E.D. Cal. Jan. 20, 2012)........... passim

*Eclipse Assocs. Ltd. v. Data Gen. Corp.,*
 894 F.2d 1114 (9th Cir. 1990) ............................................................... 26

*Halo Mgmt. LLC v. Interland, Inc.,*
 308 F. Supp. 2d 1019 (N.D. Cal. 2003) .................................................. 29

*Hansen Beverage Co. v. Nat'l Beverage Corp.,*
 493 F.3d 1074, *vacated as moot by* 499 F.3d 923 (9th Cir. 2007) ............... passim

*KP Permanent Make-Up v. Lasting Impression,*
 543 U.S. 111 (2004)................................................................................ 19

*Learning Internet v. Learn.com, Inc.,*
 No. CV-07-227-AC, 2009 WL 6059550 (D. Or. Nov. 25, 2009)........... 20

*M2 Software, Inc. v. Madacy Entertainment,*
 421 F.3d 1073 (9th Cir. 2005) ................................................... 18, 20, 22

*Matrix Motor Co. v. Toyota,*
 290 F. Supp. 2d 1083 (C.D. Cal. 2003) .................................................. 22

*Mattel, Inc. v. MGA Entertainment, Inc.,*
 782 F. Supp. 2d 911 (C.D. Cal. 2011) ......................................... 19, 23, 32

*Miss World (UK) Ltd., v. Mrs. America Pageants,*
 856 F.2d 1445 (9th Cir. 1988) ............................................................... 26

iii   DEFENDANTS' MEMORANDUM IN SUPPORT OF
 MOTION FOR PARTIAL SUMMARY JUDGMENT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Moose Creek, Inc. v. Abercrombie & Fitch Co.,*
331 F. Supp. 2d 1214 (C.D. Cal.) ............................................................ 30

*Nautilus Group, Inc. v. Savvier, Inc.,*
427 F. Supp. 2d 990 (W.D. Wash. 2006)................................................ 21, 31

*Newport Pacific Corp. v. Moe's Southwest Grill, LLC,*
No. 05-995-KI, 2006 WL 2811905 (D. Or. Sept. 28, 2006)........................ 21, 29

*Nora Beverages, Inc. v. The Perrier Group of Am.,*
269 F.3d 114 (2d Cir. 2001) .................................................................. 23

*One Indus., LLC v. Jim O'Neal Dist., Inc.,*
578 F.3d 1154 (9th Cir. 2009) ...................................................... 20, 26, 29, 32

*Speedry Products, Inc. v. Dri Mark Products, Inc.,*
271 F.2d 646 (2d Cir. 1959) .......................................................... 24, 25, 31

*Surfvivor Media, Inc. v. Survivor Productions,*
406 F.3d 625 (9th Cir. 2005) ................................................................ 20, 29

*Too Marker Prod., Inc. v. Shinhan Art Materials, Inc.,*
No. CV09-1013-PK, 2010 WL 4781531 (D. Or. Oct. 1, 2010), *adopted
by* 2010 WL 4778341 (D. Or. Nov. 17, 2010) (Mosman, J.)......................... 11

*Versa Products, Inc. v. Bifold Co.,*
50 F.3d 189 (3d Cir. 1995) ................................................................... 31

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.,*
529 U.S. 205 (2000)........................................................................... 19

## Other Authorities

1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*
§ 11:26 (2d ed. 1984) ......................................................................... 26

4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*
§ 23:101 (4th ed. 2004)....................................................................... 30

## Rules

Fed. R. Civ. P. 56(c) ............................................................................ 20

iv   DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

86860-0001/LEGAL24916038

## I.    INTRODUCTION

This is a trademark infringement case involving two vastly different markers that share a basic, geometric shape - a squarish body - that is commonly employed in the general marker market.  Plaintiffs Too Marker Products, Inc. ("Too Marker") and Imagination International, Inc. ("Imagination," collectively with Too Marker the "Copic Plaintiffs") claim that a marker sold by Defendants CC International LLC ("Crafter's Companion") and Hot Off The Press ("HOTP," collectively with Crafter's Companion, the "Spectrum Noir Defendants") infringes on and unfairly competes with a marker (the "Copic marker") sold by the Copic Plaintiffs that embodies two registered product configuration marks.  The Copic Plaintiffs, however, cannot meet their burden on these trademark infringement and unfair competition claims because the Copic Plaintiffs cannot demonstrate the requisite probable likelihood of confusion between the Copic markers and the Spectrum Noir markers.  The images of the Copic and Spectrum Noir markers shown below demonstrate that these marks are dissimilar and there is no likelihood of confusion.

**COPIC AND SPECTRUM NOIR MARKERS[1]**



---

[1] True and correct copies of these images are attached to the Declaration of Julia E. Markley, dated November 21, 2012 ("Markley Decl.") as Exhibit 1.  All images of markers in this memorandum are not lifesize and are reduced.

1-    DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT

86860-0001/LEGAL24916038

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

While no discovery has been conducted in this case, none is required. This motion is intended to limit the inappropriate use of the Court's and the parties' resources on unnecessary and costly discovery and any associated motion practice. No discovery is needed because a simple, visual inspection of the Copic and Spectrum Noir markers demonstrates clear and distinguishing differences between the markers, which in turn show that there is no probable likelihood of confusion as a matter of law. "Where the two marks are entirely dissimilar, there is no likelihood of confusion. 'Pepsi' does not infringe Coca Cola's 'Coke.' Nothing further need be said." *Brookfield Commc'ns, Inc. v. West Coast Entm't, Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999).

As shown above, the main differences between these markers are the highly distinctive brand names of each marker, either Copic or Spectrum Noir, that are prominently displayed on the respective markers. This alone negates any possibility of a likelihood of confusion. Additionally, the geometric shape of the end caps of the markers are nothing alike. Based purely on the appearances of the markers, there is a distinct improbability of any consumer confusion.

In addition to the differences in appearance, other legally relevant factors show the improbability of a likelihood of confusion here. The Copic product configuration marks are weak and further weakened by the prevalence of other squarish shaped markers on the market, which is unsurprising because such a shape serves the obvious function of preventing the marker from rolling around. The Copic Plaintiffs' claims are not supported by any evidence of actual confusion. Additionally, consumers would exercise a high degree of care when choosing a marker because of the significant price difference between the Copic and Spectrum Noir markers. Finally, there is no intent to deceive on the part of the Spectrum Noir Defendants.

Accordingly, none of Plaintiffs' claims have merit, and they are ripe for an early dismissal on summary judgment. The Spectrum Noir Defendants respectfully request that all the

Copic Plaintiffs' claims be dismissed and that the Court grant the Spectrum Noir Defendants' request for declaratory relief contained in their counterclaims as to non-infringement.

## II.      STATEMENT OF FACTS

### A.      The Spectrum Noir Markers

#### 1.      Crafter's Companion and Alcohol Markers in General

Crafter's Companion is a well-known importer and seller of craft products in the United States.  (Declaration of Gary Barbee, dated November 8, 2012 ("Barbee Decl.") ¶ 2.)  Crafter's Companion sells paper, stamps, card kits, tools for crafters, items under the Beatrix Potter brand, and other craft products.  (*Id.* ¶ 3, Ex. 1.)  In approximately November 2010, Crafter's Companion decided to produce and sell an alcohol marker for the craft market.  (Declaration of Simon Davies, dated November 8, 2012 ("Davies Decl.") ¶ 2.)  Crafter's Companion believed that it could design, market, and sell an affordable, yet high quality alcohol marker created specifically for the craft market.  (*Id.* ¶ 3; *see also* Barbee Decl., Ex. 1.)

What distinguishes alcohol markers from other types of markers is that alcohol markers allow a user to blend together different shades of colors, thereby creating a gradient between the shades and thus shadow and highlighting effects.  (Barbee Decl. ¶ 5.)  By applying a darker shade of a color to a lighter shade of the same color and using the tip of the markers to mix the shades together, a user can achieve a smooth blend of shades in a color grouping.  (*Id.*)  Also, the use of alcohol in the markers reduces coloring lines.  (*Id.*)  Blending alcohol markers, which are colorless, can be used to further smooth the gradient between shades of colors or to "erase" color.  (*Id.*)

### 2.    The Old Spectrum Noir Markers[2]

In approximately September 2011, Crafter's Companion imported and sold to HOTP a single shipment of alcohol markers under the Spectrum Noir mark (the "old Spectrum Noir markers"). (*Id.* ¶ 6.)  Below are images of the old Spectrum Noir marker.[3]



As seen in the images above, the old Spectrum Noir markers were black with a squarish body shape, which was chosen because this body shape was presented by the manufacturer and it was a reasonable price.  Crafter's Companion did not consider a round body shape because it was not presented as an option.  There were not many round marker shapes available, assumedly because they too easily roll off the user's desk.  (Davies Decl. ¶ 4.)  The word mark "Spectrum Noir" is prominently written in large, white letters on the body of the marker.  The old Spectrum Noir markers had dual marker tips, one fine and one broad, with words and symbols on the back of the marker body to indicate the respective tips, as well as a gray line at the end cap and body

---

[2] While not admitting that the old Spectrum Noir marker product configuration infringes upon or constitutes unfair competition with the product configuration marks of the Copic markers, the Spectrum Noir Defendants do not include this old Spectrum Noir marker in this motion.  If the Court grants this motion, then the only dispute between the parties will be whether sales from that single shipment of the old Spectrum Noir markers infringed any of the Copic Plaintiffs' rights.

[3] True and correct copies of these images are attached to the Markley Declaration as Exhibit 2.  Additionally, a physical sample of this marker is being conventionally filed with the Clerk of the Court as Exhibit 3, and a substantially similar marker, except with respect to color, is being provided to the Court and opposing counsel.

juncture to indicate the fine tip and a black line at the end cap and body juncture to indicate the broad tip.  The end cap began with the same squarish shape and size of the body of the marker and then tapered.  Also, the end cap permitted a user to store it on the opposing end cap when one tip of the marker was being used.  The terminal end of the end cap was indented with a color band indicating the color of the marker.  The color band began on the body of the end cap and then there was an indentation in the color band itself.  The terminal end was flat and had a number and the name of the color.

The old Spectrum Noir markers were sold only in sets of 6.  (Barbee Decl. ¶ 7.)  A set of 6 was chosen because a user needs 3 alcohol markers in the same color family — a light, a mid and a dark shade — to create a good blend.  (*Id.*)  A set of 6 provides a better price point than a set of 3 and provided more blending possibilities.  (*Id.*)  Crafter's Companion sold approximately 2,100 sets of 6 in the United States in 2011, all to HOTP.  (*Id.* ¶ 6.)

Crafter's Companion stopped selling the old Spectrum Noir marker in the United States in approximately September 2011 and has discontinued the old Spectrum Noir marker completely.  (*Id.* ¶ 8.)  HOTP has sold its entire inventory of the old Spectrum Noir marker. (Declaration of Paulette Jarvey, dated November 8, 2012 ("Jarvey Decl.") ¶ 5.)

### 3.    The Current Spectrum Noir Markers

In approximately August 2011, Crafter's Companion decided to change the end cap configuration and color numbering system of its marker.  (Davies Decl. ¶ 5.)  Below is an image of the current Spectrum Noir marker.[4]

---

[4] True and correct copies of these images are attached to the Markley Declaration as Exhibit 4.  Additionally, a physical sample of this marker is being conventionally filed, as part of a set of 6 markers, with the Clerk of the Court as Exhibit 5, and a similar set of 6 markers is being provided to the Court and to opposing counsel.



Crafter's Companion decided to keep the squarish, black body because that shape had worked fine on the old Spectrum Noir marker. The functionality of the squarish body shape was obvious because this shape prevents markers from rolling when set on flat surfaces. (*Id.*) The word mark "Spectrum Noir" was maintained and is written prominently in large, white letters on the body of the marker. The end cap was changed to an hourglass shape, without either of the two indentations on the end cap of the old Spectrum Noir marker, because this hourglass shape allowed the user to grip the end cap better when removing it. (*Id.*) The current end cap configuration, however, does not permit a user to store an end cap on the opposing end cap when a tip of the marker is being used. The numbering system for the markers was changed to an alpha-numeric system, based on color families. The names of colors (e.g., "Walnut" or "Light Violet") were eliminated. The alpha-numbering of the color is written in black on the terminal end of each end cap. (*Id.*) The letter portion of the symbol indicates the color group of the marker, while the number portion indicates the shade of the marker within that color group, where 1 represents the lightest shade and 11 represents the darkest shade. (*Id.*; *see also* Barbee Decl., Ex. 1.) The terminal end of the end cap still has a color band, although not indented, to indicate the color of the marker. (Davies Decl. ¶ 5.)

The current Spectrum Noir markers are available in 168 color options and are sold only in sets of 6 or 24. (Barbee Decl., Ex. 1.) The only marker that is sold individually is the colorless blender marker. (*Id.* ¶ 11 & Ex. 1.) There are 12 sets of 6 markers that make up the

core line of colors.  (*Id.*, Ex. 1.)  There are 4 sets of 24 that round out the color ranges and are

sold in tonal packs:  lights, brights, darks and pastels.  (*Id.*)  The 6- and 24-piece sets retail for

approximately $11.95 and $49.95, respectively.  (*Id.*; Jarvey Decl., Ex. 1.)  The 6-piece sets are

sold in a non-reusable, paper-backed plastic packaging; the 24-piece sets are sold in a soft plastic

case that customers may use to store the markers with the color band facing up.  (*See* Barbee

Decl., Ex. 1; Markley Decl., Ex. 2.)  The paper-backing of the 6-piece sets packaging

prominently displays the Spectrum Noir word mark, as does the soft plastic case packaging for

the 24-piece set.  (*See* Barbee Decl., Ex. 1; Markley Decl., Ex. 4.)  Below are images of the 6-

and 24-piece sets of the current Spectrum Noir markers.[5]




Spectrum Noir markers are sold in craft stores, such as Joann Fabric and Craft Stores and

A.C. Moore (Barbee Decl. ¶ 9) and sold on-line at the website www.crafterscompanion.com (*id.*,

Ex. 1), as well as in other on-line craft supply sources, such as www.paperwishes.com and

www.joann.com (Jarvey Decl., Ex. 1; Markley Decl., Ex. 6).  Crafter's Companion sells both

directly to consumers through its website and to wholesale distributors, who in turn may sell

directly to consumers or other retail entities.  (Barbee Decl. ¶ 9.)  HOTP is one of Crafter's

---

[5] These images were taken from the website www.crafterscompanion.com.  True and
correct copies of selected pages of this website  are attached to the Barbee Declaration as
Exhibit 1.  Additionally, a physical sample of this set of 6 markers is being filed with the Clerk
of the Court as Markley Declaration Exhibit 5 and provided to the Court and to opposing
counsel.

7-    DEFENDANTS' MEMORANDUM IN SUPPORT OF
      MOTION FOR PARTIAL SUMMARY JUDGMENT

Companion's distributors.  (*Id.*)  HOTP promotes and sells to consumers the Crafter's

Companion products through catalogs and online.  (Jarvey Decl. ¶ 3.)  In 2012, Crafter's

Companion has sold many sets of 6 and sets of 24 of the current Spectrum Noir markers in the

United States.[6]  (Barbee Decl. ¶ 10.)

## B.    The Copic Markers

Too Marker has two trademark registrations for certain aspects of the product

configuration of Copic marker at issue in this case.  The first, Registration No. 3,629,617, is for a

mark consisting:

> of a configuration of a marker having a squarish cross-sectional
> shape in which the terminal portion of both end caps of the marker
> are indented relative to the body of the marker and a band, which
> indicates that placement of a contrasting color, is integrally formed
> in the body of the marker at the juncture of the end cap and body,
> the squarish cross-section having rounded corners and the end caps
> having flat ends.

(Markley Decl., Ex. 7.)

This mark (the "body configuration mark") was registered on June 2, 2009, and the

registration states that the mark was first used in 1987 and first used in commerce in 1999.

Neither the color nor the text on the end cap is claimed as a feature of this mark.  (*Id.*)

The second registration, Registration No. 4,113,852 (the "terminal end configuration

mark"), is for only a portion of the end cap, which essentially restates a section of the description

in the body configuration mark.  The terminal end configuration registration states that:

> The mark consists of the configuration of an end portion of a
> marker cap having a squarish cross-sectional shape with rounded
> corners and a squarish flat end face that is laterally indented
> relative to the body of the cap.

---

[6] Counsel for the Spectrum Noir Defendants and the Copic Plaintiffs are currently
discussing a two-tiered stipulated protective order for this case.  When a protective order is
entered by the Court, the Spectrum Noir Defendants are prepared to provide an estimate of the
number of sets of 6 and sets of 24 current Spectrum Noir markers that have been sold in the
United States in 2012.

(*Id.*, Ex. 8.)

The terminal end configuration mark was registered on March 20, 2012, and the registration states that the mark was first used in 1987 and first used in commerce in 1999. Again, neither the color nor the text on the end cap is claimed as a feature of this mark.  (*See id.*)

An image of a Copic marker is shown below.[7]



The light gray, squarish body of the marker has the "COPIC" word mark prominently displayed, as well as "MADE IN JAPAN," ".Too," an alpha-numeric symbol (which is identical to the one shown on the terminal end of the end cap), and a bar code.  The back of the marker does not have any markings or symbols.  The Copic marker is dual-tipped, with symbols on the front of the body of the marker that indicate the two different styles of tips.  There is no word indication corresponding to the style of tip at each end.  There are also lines where the cap and body meet that are either the same color or dark gray, which indicate either a broad or fine tip, respectively.

The Copic markers are available in 214 color options and are sold individually or in sets of 12, 36, or 72 pieces.  (*Id.*, Ex. 11.)  Individual Copic markers retail for approximately $6.99 a piece, and the 12-, 36-, and 72-piece sets retail for approximately $83.88, $251.64, and $503.28, respectively.  (*Id.*)  The 12-, 36-, and 72-piece sets are sold in hard plastic cases that have small plastic frames on the bottom of the case that enable the customer to store and use the markers in

---

[7] True and correct copies of these images are attached to the Markley Declaration as Exhibit 9.  Additionally, a physical sample of this marker is being conventionally filed with the Clerk of the Court as Exhibit 10, and a substantially similar marker, except with respect to color, is being provided to the Court and to opposing counsel.

the case with the color band easily visible.  The hard plastic cases prominently display the Copic word mark.  (*Id.*)  Images of the Copic marker sets are shown below.[8]

  

Copic markers are sold online and in stores.  Online stores include www.store.copicmarker.com, www.dickblick.com, www.markerpop.com, and www.joann.com. (*Id.*, Exs. 11, 13, 14, 6.)  Copic markers are also available in brick-and-mortar stores such as art supply stores like Dick Blick.  (*Id.*, Ex. 15.)

In addition to selling alcohol markers with the product configuration described above under the Copic word mark, there are also markers with the Copic word mark that are described as Ciao, Sketch, and Wide.  (*Id.*, Ex. 11.)  These markers have the product configuration shown below.[9]



---

[8] True and correct copies of the images of the 12 piece set are attached to the Markley Declaration as Exhibit 12.  The images of the 36 and 72 piece sets are from the website www.store.copicmarker.com, and true and correct copies of selected pages of that website are attached to the Markley Declaration as Exhibit 11.

[9] True and correct copies of these images are attached to the Markley Declaration as Exhibits 16, 18, 20.  Additionally, physical samples of these markers are being conventionally filed with the Clerk of the Court as Exhibits 17, 19, 20, and a substantially similar marker, except with respect to color, is being provided to the Court and to opposing counsel.

### C.    Other Alcohol Based Markers Available in the United States

### 1.    The Shinhan Touch Markers

#### a.    The Old Shinhan Touch Marker

On August 27, 2009, the Copic Plaintiffs filed a lawsuit in this Court against Shinhan Art Materials, Inc. ("Shinhan"), as well as another co-defendant, alleging that the product configuration of the markers manufactured and sold by Shinhan under the Touch word mark (the "old Shinhan Touch markers") infringed on the body configuration mark of the Copic marker. (*Id.*, Ex. 22.)  After Judge Papak denied cross-motions for summary judgment on the validity of the body configuration registration mark based on nonfunctionality,[10] the parties to the lawsuit reached a settlement agreement, and the case was dismissed in April 2011.  (*Id.*, Ex. 23.)

An example of the old Shinhan Touch marker is shown below.[11]



The old Shinhan Touch markers had some similarities with the old Spectrum Noir markers.  They were both black with a squarish body shape.  The old Shinhan Touch marker also had dual marker tips, one fine and one broad, with words and symbols on the front of the marker body to indicate the respective tips, as well as a gray line at the end cap and body juncture to

---

[10] *Too Marker Prod., Inc. v. Shinhan Art Materials, Inc.*, No. CV09-1013-PK, 2010 WL 4781531 (D. Or. Oct. 1, 2010), *adopted by* 2010 WL 4778341 (D. Or. Nov. 17, 2010) (Mosman, J.).

[11] True and correct copies of these images are attached to the Markley Declaration as Exhibit 24.  Additionally, a physical sample of this marker is being conventionally filed with the Clerk of the Court as Exhibit 25 and a substantially similar marker, except with respect to color, is being provided to the Court and to opposing counsel.

indicate the fine tip and a black line at the end cap and body juncture to indicate the broad tip. The end cap began with the same squarish shape and size of the body of the marker and then tapered.  Also, the end cap permitted a user to store it on the opposing end cap when one tip of the marker was being used.  The terminal end of the end cap was indented with a color band indicating the color of the marker.  The color band began on the body of the end cap and then there was an indentation in the color band itself.  The terminal end was also flat and had a number and the name of the color.

There were also differences between the old Shinhan Touch markers and the old Spectrum Noir markers.  The Touch word mark was displayed prominently on the squarish black body of the old Shinhan Touch marker.  Also, the front of the marker had the wording "ShinHan Art International Inc." and the seal of the Art & Creative Materials, Institute, Inc.  The back of the body of the marker had a bar code, "MADE IN KOREA," and a number that corresponded to the number on the terminal end of the end cap.  None of those elements were present on the old Spectrum Noir marker.

### b.    The Current Shinhan Touch Markers

After settling its lawsuit with the Copic Plaintiffs, Shinhan changed the product configuration for its markers, but kept a squarish shaped body, the color band on the end cap, and the flat terminal ends on the end caps.  It currently sells two markers with substantially the same product configuration.  One is called the Touch Twin Brush Marker (the "current Shinhan Touch brush marker") and the other is called the Touch Twin Marker (the "current Shinhan Touch fine marker," collectively the "current Shinhan Touch markers").  The main differences between the current markers is that the current Shinhan Touch brush marker has a brush and a medium broad

tip and a white, squarish body, while the current Shinhan Touch fine marker has both a fine and a broad tip as well as a black, squarish body. Below are images of the these two markers.[12]



The current Shinhan Touch markers are either black or white with a squarish body shape and rounded corners. The "Touch" word mark is displayed prominently on the squarish body of the current Shinhan Touch marker. Also, the front of the marker has the wording "ShinHanart" and "www.shinhanart.com," as well as the seal of the Art & Creative Materials, Institute, Inc. The back of the body of the marker has a bar code, "MADE IN KOREA," and an alphanumeric symbol that corresponds to the color symbol on the terminal end of the end cap. The current Shinhan Touch markers also have dual marker tips and words and symbols on the front of the marker body to indicate the respective tips, as well as different color lines at the end cap and body juncture to indicate the type of tip. The end cap begins with the same squarish shape and size of the body of the marker and then tapers gradually. The end cap permits a user to store an end cap on the opposing end cap when one tip of the marker is being used. The terminal end of the end cap has a squarish color band indicating the color of the marker. The terminal end is also flat and has an alphanumeric symbol and the name of the color.

The current Shinhan Touch markers are available in 168 color options and, like the Copic marker, are sold individually or in sets of 12. (Markley Decl., Ex. 29.) The current Shinhan

---

[12] True and correct copies of these images are attached to the Markley Declaration as Exhibit 26. Additionally, physical samples of these markers are being conventionally filed with the Clerk of the Court as Exhibits 27 and 28, respectively, and substantially similar markers, except with respect to color, are being provided to the Court and to opposing counsel.

Touch brush marker is also available in sets of 24, 36, 48, and 60.  (*Id.*, Ex. 14.)  Individual

current Shinhan Touch brush markers retail for approximately $6.50 and the 12-, 24-, 36-, 48-,

and 60-piece sets retail for approximately $78.00, $156.00, $234.00, $312.00, and $390.00,

respectively.  (*Id.*)  Individual current Shinhan Touch fine markers retail for approximately $5.50

and the 12-piece sets retail for approximately $66.00.  (*Id.*, Ex. 29.)  The 12- and 24-piece sets

are sold in a hard plastic cases that enable the customer to store and use the markers in the case

with the color band easily visible.  (*Id.*)  Images of selected sets of the current Shinhan Touch

markers are shown below.[13]



The current ShinHan Touch markers are sold on-line at the website www.pearlpaint.com

and markerpop.com.  (*Id.*, Exs. 14, 29.)

### 2.    The Kurecolor Markers

Yet another alcohol marker with a squarish shaped body, the end caps with color bands,

and flat terminal ends is also available with the Kurecolor word mark (the "Kurecolor marker").

Images of the Kurecolor marker are shown below.[14]

---

[13] These images are from the websites www.markerpop.com and www.pearlpaint.com and true and correct copies of selected pages from these websites are attached to the Markley Declaration as Exhibits 14 and 29.

[14] True and correct copies of these images are attached to the Markley Declaration as Exhibit 30.  Additionally, a physical sample of this marker is being conventionally filed with the Clerk of the Court as Exhibit 31, and a substantially similar marker, except with respect to color, is being provided to the Court and to opposing counsel.



The product configuration for the Kurecolor marker consists of a squarish shaped body with dual marker tips and squarish end caps that tapers. The terminal end is flat and has a squarish shape with a circle indicating the color and number of the marker as well as the name of the color. The "Kurecolor" word mark is displayed prominently on the black body of the marker, along with "ZIG" and wording such as "FOR GRAPHIC ARTISTS," as well as other markings.

The Kurecolor markers are available in 106 color options and are sold individually or in a set of 12 pieces. (*Id.*, Exs. 6, 32, 33.) The 12-piece sets are sold in a clear, soft plastic reusable package. (*Id.*, Ex. 33.) Below is an image of a 12-piece Kurecolor marker set.[15]



The Kurecolor markers are on-line at the website www.acmoore.com, www.joann.com, and www.markersupply.com. (*Id.*, Exs. 6, 32, 33.)

---

[15] These images are from the website www.acmoore.com and true and correct copies of selected pages of this website are attached to the Markley Declaration as Exhibit 33.

15- DEFENDANTS' MEMORANDUM IN SUPPORT OF
     MOTION FOR PARTIAL SUMMARY JUDGMENT

### 3.    The Pantone Markers

An alcohol marker sold under the Pantone word mark (the "Pantone marker"), again with a squarish shaped body, a color band on the end cap, and end caps with terminal flat ends,  is also available.  Images of the Pantone marker are shown below.[16]



The product configuration for the Pantone marker consists of a squarish shaped body that tapers at one end, with dual marker tips, and a squarish end cap.  The terminal end is flat and has a squarish shape with a thick line indicating the color of the marker and the number.  The "PANTONE" word mark is displayed prominently on the white body of the marker, along with a thick line indicating the color of the marker and the same number that is on the terminal end cap. The name of the color (e.g., "Violet Storm"), "Made in Japan," and other markings are displayed on the back of the marker.

The Pantone markers are sold individually or in sets of 12, 24, 36, or 72 pieces.  (*Id.*, Ex. 13.)  The 12-piece sets are sold in a clear, soft plastic  reusable package and the 24-, 36-, and 72-piece sets are sold in sturdy, reusable cardboard boxes.  (*Id.*)  Below are images of a 12- and a 24-piece set of Pantone markers.[17]

---

[16] True and correct copies of these images are attached to the Markley Declaration as Exhibit 34.  Additionally, a physical sample of this marker is being conventionally filed with the Clerk of the Court as Exhibit 35, and a substantially similar marker, except with respect to color, is being provided to the Court and to opposing counsel.

[17] These images are from the website www.dickblick.com and true and correct copies of selected pages of this website are attached to the Markley Declaration as Exhibit 15.



The Pantone markers are on-line at the website www.dickblick.com.  (*Id.*)

### 4.    The MEPXY Markers

On April 25, 2012, the Copic Plaintiffs filed a separate lawsuit in this Court against

Creation Supply Inc. and John Gragg, claiming trademark infringement and unfair competition

against the body configuration mark and the terminal end configuration mark based on the design

of a marker sold under the MEPXY mark (the "MEPXY markers").  *Too Marker Prod., Inc. v.*

*Creation Supply, Inc.*, No. 3:12-cv-00735-BR.  The case is pending.

Images of the MEPXY markers are shown below.[18]



### III.    LEGAL STANDARDS

The Spectrum Noir Defendants seek summary judgment on the current Spectrum Noir

marker only with respect to the Copic Plaintiffs' four claims and the Spectrum Noir Defendants'

---

[18] True and correct copies of these images are attached to the Markley Declaration as
Exhibit 36.  Additionally, a physical sample of this marker is being conventionally filed with the
Court as Exhibit 37, and a substantially similar marker, except with respect to color, is being
provided to the Court and to opposing counsel.

counterclaims for declaratory relief of non-infringement. The Copic Plaintiffs allege that: (1) the Spectrum Noir Defendants have infringed the body configuration mark; (2) the Spectrum Noir Defendants have infringed the terminal end configuration mark; (3) the product configuration of the Spectrum Noir markers constitutes unfair competition under Lanham Act § 43; and (4) the product configuration of the Spectrum Noir markers constitutes trademark infringement under common law. The Copic Plaintiffs' claims with respect to the current Spectrum Noir marker fail as a matter of law.

## A.　　The Law of Trademark Infringement and Unfair Competition

### 1.　　Significant Dissimilarity of Product Configuration Marks as They Appear in the Marketplace Can Establish Lack of Likelihood of Confusion.

For both federal and common law trademark infringement and unfair competition claims, a plaintiff has the burden to prove that there is a likelihood of confusion between the parties' marks as used with their respective goods and services. *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1080 (9th Cir. 2005). To determine whether there is a likelihood of confusion, courts in the Ninth Circuit consider the following eight *Sleekcraft* factors: "(1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines." *Id.* (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)).

"Some *Sleekcraft* factors are much more important than others, and the relative importance of each individual factor will be case specific." *Id.* (internal quotation marks and citation omitted). "In many cases, similarity of the marks is the factor most probative of the likelihood of confusion." *Hansen Beverage Co. v. Nat'l Beverage Corp.*, 493 F.3d 1074, 1078, *vacated as moot by* 499 F.3d 923 (9th Cir. 2007). "In the Ninth Circuit, significant dissimilarity of the marks alone can be sufficient to establish a lack of likelihood of confusion" on a summary judgment motion. *E&J Gallo v. Proximo Spirits, Inc.*, No. CV-F-10-411 LJO JLT, 2012 WL

18-　DEFENDANTS' MEMORANDUM IN SUPPORT OF
　　MOTION FOR PARTIAL SUMMARY JUDGMENT

273076, at *15 (E.D. Cal. Jan. 30, 2012) (citing *Hansen Beverage*, 493 F.3d 1074). Where two marks are entirely dissimilar, there is no likelihood of confusion, even if the goods and marketing channels are the same. *Brookfield Commc'ns*, 174 F.3d at 1054. "[The] burden of proving likelihood of confusion (that is, infringement) [remains] on the party charging infringement even when relying on an incontestable registration . . . ." *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 112 (2004).

<blockquote>

**2.      Functional and Nondistinctive Product Configurations Are Not Protectable Under Trademark and Unfair Competition Law.**

</blockquote>

In addition to proving likelihood of confusion, a plaintiff alleging trademark infringement and unfair competition claims related to product configuration must prove that the product configuration is not functional and that the product configuration serves a source-identifying role either because it is inherently distinctive or has acquired distinctiveness through secondary meaning. *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205 (2000); *see also Mattel, Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d 911, 1003-04 (C.D. Cal. 2011) (finding registered product configuration marks not protectable because they were functional and nondistinctive). A trademark based on a product's configuration is not inherently distinctive. *Wal-Mart*, 529 U.S. at 216. Additionally, courts consistently find that "ordinary geometric shapes," such as trapezoids or hearts, are nondistinctive and protectable only upon proof of secondary meaning. *Mattel*, 782 F. Supp. 2d at 1004. For a product configuration to acquire secondary meaning, the primary significance of the mark must "identify the source of the product rather than the product itself" in the minds of the public. *Wal-Mart*, 529 U.S. at 211 (internal quotation marks and citation omitted); *see also Mattel*, 782 F. Supp. 2d at 1004.

While the product configuration for the Copic markers is functional and nondistinctive because the configuration involves basic geometric shapes, namely squares, the Spectrum Noir Defendants do not move for summary judgment at this time on these grounds because there has

been no discovery in this matter.  However, the Spectrum Noir Defendants reserve their right to raise these issues.

**B.      To Avoid Summary Dismissal of Trademark Infringement and Unfair Competition Claims, a Plaintiff Must Show a Probable Likelihood of Confusion.**

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact that would preclude summary judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Once the moving party has satisfied its burden, it is entitled to summary judgment if the nonmoving party fails to present by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted).

To defeat an accused infringer's summary judgment motion on likelihood of confusion, the trademark claimant must come forward with evidence sufficient to permit a rational trier of fact to find that confusion is probable, not merely possible.  *M2 Software*, 421 F.3d at 1084-85.  A district court may determine likelihood of confusion as a matter of law on summary judgment despite the factual underpinnings of the issue.  *Id*. at 1079-80.  The fact that one or more of the *Sleekcraft* factors may weigh in favor of infringement will not prevent entry of summary judgment dismissing the infringement claim.  *See, e.g., One Indus., LLC v. Jim O'Neal Dist., Inc.*, 578 F.3d 1154, 1162-65 (9th Cir. 2009) (affirming summary judgment of no likelihood of confusion in case between two direct competitors, despite finding that 3 of 8 *Sleekcraft* factors weighed in favor of infringement); *Surfvivor Media, Inc. v. Survivor Prod.*, 406 F.3d 625, 629-35 (9th Cir. 2005) (affirming summary judgment of no likelihood of confusion despite finding that 4 of 8 *Sleekcraft* factors weighed in favor of infringement); *M2 Software*, 421 F.3d at 1080-85 (affirming summary judgment of no likelihood of confusion despite finding that 3 of 8 *Sleekcraft* factors weighed in favor of infringement); *Learning Internet v. Learn.com, Inc.*, No. CV-07-227-AC, 2009 WL 6059550, at *16-30 (D. Or. Nov. 25, 2009) (granting summary judgment

dismissing trademark infringement claim despite finding that genuine fact issue existed as to strength of the mark, and that the relatedness of the goods and services weighed in favor of infringement); *Newport Pac. Corp. v. Moe's SW Grill, LLC*, No. 05-995-KI, 2006 WL 2811905, at *12-17 (D. Or. Sept. 28, 2006) (granting summary judgment dismissing infringement claim despite finding that 3 of 8 factors weighed in favor of infringement); *E&J Gallo*, 2012 WL 273076, at *14-19 (granting summary judgment dismissing trademark infringement claim despite finding that parties were direct competitors with identical goods); *Nautilus Grp., Inc. v. Savvier, Inc.*, 427 F. Supp. 2d 990, 995-99 (W.D. Wash. 2006) (granting summary judgment dismissing trademark infringement claim despite fact that plaintiff's mark was strong and products covered by the marks were distributed through similar marketing channels).

In the last analysis, if the evidence taken as a whole fails to persuade the court that a reasonable trier of fact could find a *probability* of confusion, the claim should be dismissed. *See Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 (9th Cir. 2002).

## IV.    ANALYSIS

### A.    The *Sleekcraft* Factors Favor Dismissal of the Copic Plaintiffs' Trademark Infringement and Unfair Competition Claims

Here, five of the *Sleekcraft* factors considered together demonstrate the decided improbability of the Copic Plaintiffs' claims, specifically the dissimilarity of the parties' respective markers, the weakness of the Copic Plaintiffs' asserted trademarks, the lack of actual confusion, the high level of care exercised by consumers because of the price difference, and the lack of an intent to deceive.[19]

---

[19] For the purposes of this motion only, the Spectrum Noir Defendants concede: (1) that the goods are similar and (2) that the parties use similar marketing channels. Likelihood of expansion is irrelevant because of the concession of similar goods and marketing channels. *See Brookfield Commc'ns*, 174 F.3d at 1060.

1. **Dissimilarity of the Marks: The Parties' Respective Markers Differ Dramatically, and This Factor Weighs Heavily Against a Likelihood of Confusion.**

A simple, visual examination of the two markers at issue shows that the Copic Plaintiffs cannot meet their burden to demonstrate a probable likelihood of confusion.



In the Ninth Circuit, significant dissimilarity of the marks alone can be sufficient to establish a lack of likelihood of confusion. *Hansen Beverage*, 493 F.2d at 1074 (reversing grant of a preliminary injunction where marks were dissimilar); *E&J Gallo*, 2012 WL 273076, at *15 (granting summary judgment where marks were dissimilar). The marks being compared must not be viewed in isolation, but must be considered in light of the way the marks are encountered in the marketplace and the circumstances surrounding the purchase of the products. *M2 Software*, 421 F.3d at 1082. "[M]arks may not be dissected, but must be compared in their entirety." *Matrix Motor Co. v. Toyota*, 290 F. Supp. 2d 1083, 1093 (C.D. Cal. 2003).

The most prominent features of the markers—their brand names—are distinctly different. On the current Spectrum Noir marker, the "Spectrum Noir" word mark is written in large, white letters on the black body of the marker. On the Copic marker, the "Copic" word mark is written in large, black letters on the light gray body of the marker. The fonts used in the Copic and Spectrum Noir word marks are also different. Not only do the word marks look nothing alike, Spectrum Noir and Copic do not sound alike and, to the extent that either word mark has meaning, the word marks do not share any similar meanings. *See Sleekcraft*, 599 F.2d at 351 ("Similarity of marks is tested on three levels; sight, sound, and meaning."). There are other

physical elements of the markers that differ.  The Copic marker has other words and symbols on the front of the body of the marker, such as "MADE IN JAPAN," ".Too," and a bar code.  The current Spectrum Noir marker has no other words or symbols on the front of its body.  Additionally, the current Spectrum Noir marker is longer than the Copic marker.

The end caps of the markers differ significantly.  The current Spectrum Noir marker has an hourglass shape with no indentations and a color band at the end.  The terminal end of the end cap does not include a marking indicating the name of the color of the marker.  The Copic marker end cap, on the other hand, does not have an hourglass shape, but rather a consistent squarish shape with an indentation.  The terminal end includes the name of the color of the marker.

Aside from sharing a squarish shaped body and an indication of the color of the marker, the current Spectrum Noir markers and the Copic markers have nothing in common.  The significant differences between the markers, including the prominently displayed brand name, preclude any possible consumer confusion.  *See Hansen Beverage*, 493 F.3d at 1079 ("These very significant differences [different trade names prominently displayed and overall appearance] weigh heavily against a finding that consumer confusion is likely to result from the overall look of the packaging."); *E&J Gallo*, 2012 WL 273076, at *15 (E.D. Cal. 2012) (quoting same); *Mattel*, 782 F. Supp. 2d at 1008-09 (finding that "the fact that Mattel's product names appear in large, colored lettering that can be viewed from a distance leaves no issue of material fact as to whether the trade dress is similar"); *see also Nora Beverages, Inc. v. Perrier Group of Am.*, 269 F.3d 114, 123 (2d Cir. 2001) (finding the "presence of the prominent and distinctive labels alone negates any possibility of a likelihood of confusion" between two water bottles); *Bristol-Myers Squibb Co. v. McNeil -P.P.C., Inc.*, 973 F.2d 1033, 1046 (2d Cir. 1992) (finding that "[d]espite the similarity between certain aspects of the two trade dresses, when taken as a whole, including the prominently displayed names, they are not similar in any manner that is

likely to cause consumer confusion"); *Speedry Prod., Inc. v. Dri Mark Prod., Inc.*, 271 F.2d 646, 650-51 (2d Cir. 1959) ("An examination of the two markers shows that there is no such likelihood of confusion either as to source or as to the product as to justify preliminary relief.").

The Ninth Circuit's decision in *Hansen Beverage* is instructive.  In *Hansen Beverage*, the makers of MONSTER brand energy drink sued the producers of FREEK energy drink, alleging that the defendant's trade dress mimicked the plaintiff's black and green MONSTER trade dress. The Ninth Circuit reversed the trial court's grant of a preliminary injunction, holding that the very significant differences in appearances weighed heavily against a finding that consumer confusion was likely.  Specifically, the Ninth Circuit concluded:

> The appearance of the competing trade dress speaks for itself. Monster products are distinguishable from the other energy drinks on the market largely because the word "Monster" and a large "M" are prominently displayed on the cans.  Freek's trade dress does not feature either of these source-identifying marks; instead, it displays prominently its own trade name ("Freek") along with a distinctive depiction of a distorted and frightening face (the so-called "Freek Man").  These very significant differences weigh heavily against a finding that consumer confusion is likely to result from the overall look of the packaging.

*Hansen Beverage*, 493 F.3d at 1079.

These differences were enough for the Ninth Circuit to conclude that no likelihood of confusion existed — notwithstanding the district court's finding on the other *Sleekcraft* factors (i.e., that the parties sold directly competitive, relatively low-priced similar goods, using identical marketing channels to undiscriminating customers) favored the plaintiff.  The Ninth Circuit concluded that these factors would "shed little light on the likelihood of confusion between *these particular products*."  *Id.* at 1080 (emphasis in original); *cf. Brookfield Commc'ns*, 174 F.3d at 1054 ("Where the two marks are entirely dissimilar, there is no likelihood of confusion.  'Pepsi' does not infringe Coca Cola's 'Coke.'  Nothing further need be said.").

Similarly in *E&J Gallo*, the district court granted summary judgment on claims of trademark infringement and unfair competition where the trademark owner alleged that a

trapezoidal shaped tequila bottle design infringed on its registered trapezoidal shaped tequila bottle. The court held that notwithstanding the shared feature of a general trapezoidal shape, there were significant differences, including distinctive labels that did not appear to be from the same source, and that these differences weighed against a finding of likelihood of confusion. *E&J Gallo*, 2012 WL 273076, at *15-16.

Here, the significant differences in physical appearance between the Copic marker and the Spectrum Noir marker discussed above weigh heavily against a finding that consumer confusion is probable. A party seeking a "Copic" brand marker will not choose one prominently labeled "Spectrum Noir" by mistake or be confused as to the source.

In addition to the differences in the markers themselves, the markers are sold in different ways and in different types of packaging. For starters, except for the blender marker, none of the Spectrum Noir markers are sold individually. By contrast, Copic markers are available individually without any packaging at all. Also, Spectrum Noir markers are primarily sold in sets of 6 in nonreusable packaging with the Spectrum Noir word mark displayed prominently. (Barbee Decl. ¶ 11 & Ex. 1.) Copic markers are not available in 6-piece sets, but rather are sold in sets of 12, 36, or 72, and the packaging is hard plastic case that can be used to store the makers so that the Copic word mark is displayed prominently. The differences in packaging further strengthen the improbability of any confusion. *See Speedry Prod.*, 271 F.2d at 651 (finding that there was no likelihood of confusion because, in part, the "packaging is entirely different").



To the extent that there are any similarities between the current Spectrum Noir marker and the Copic marker, namely the squarish shaped body and the fact that there is an indication of

25- DEFENDANTS' MEMORANDUM IN SUPPORT OF
      MOTION FOR PARTIAL SUMMARY JUDGMENT

the color of the marker on the flat terminal end of the end cap, these similarities are common in the marker market and cannot be relied upon to show a likelihood of confusion.

**2.      The Weakness of the Marks:  The Weakness of the Copic Marks Weigh Against a Likelihood of Confusion.**

Determining the strength of a mark is a two-step process.  *One Indus.*, 578 F.3d at 1164. First, the conceptual strength of a mark is determined.  *Id*.  Second, the court must determine the strength of the mark in the marketplace.  *Id*.  A conceptually strong mark may be rendered weak by virtue of negative marketplace factors.  *Id*. (conceptually strong "fanciful" mark severely weakened by third-party uses of similar marks).

The Copic product configuration marks are weak because they are not inherently distinctive and have not acquired a secondary meaning because these marks center on a common geometric square shape.  However, the Spectrum Noir Defendants are not raising these issues in this motion because the factual record is not adequately developed at this time.  Even if the Copic product configuration marks were conceptually strong, these marks are weakened by the presence in the marker market of several other alcohol markers that have squarish shaped body configurations and color bands or other methods of indicating the color of the marker.

The Ninth Circuit has explained the adverse impact that widespread use can have on the strength of the mark:

> [A] mark which is hemmed in on all sides by similar marks on similar goods cannot be very distinctive.  It is merely one of a crowd of marks.  In such a crowd, customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other.

*Miss World (UK) Ltd., v. Mrs. America Pageants Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988) (quoting 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:26 (2d ed. 1984)), *abrogated in part on other grounds as recognized in Eclipse Assocs. Ltd. v. Data Gen. Corp.*, 894 F.2d 1114 (9th Cir. 1990); *see also One Indus.*, 578 F.3d at 1164 ("When similar marks permeate the marketplace, the strength of the mark decreases.").

The presence of several other markers with squarish body shapes that unsurprisingly serves a practical function, namely preventing the marker from rolling around, weakens any possible strength that the body configuration mark may have.  Below are images of alcohol markers with a squarish body shape.[20]



Concerning the color band on the end cap, both of the current Touch markers have a squarish color band on the terminal portion of the end cap with a color system almost identical to Copic's, namely having an alphanumeric symbol and the color name.  Again, this is not surprising because this feature serves the functional purpose of allowing a consumer to easily identify the color of a marker.

Other markers also have color indications on the end caps to assist the user in identifying the color of the marker.[21]



---

[20] True and correct copies of these images are attached to the Markley Declaration as Exhibit 38.

[21] True and correct copies of these images are attached to the Markley Declaration as Exhibit 38.

27-  DEFENDANTS' MEMORANDUM IN SUPPORT OF
     MOTION FOR PARTIAL SUMMARY JUDGMENT

Additionally, the Copic markers are available on the same websites as several of the other alcohol markers on the market, and the availability of these different brands of markers on the same or similar websites suggests that consumers have been exposed to these different brands simultaneously and have learned to distinguish between these similar squarish shaped body product configurations.[22]

| Marker Brand | Websites available at | Sold individually /Price | Sold in Sets/Prices |
|---|---|---|---|
| Copic | www.store.copicmarker.com<br>www.acmoore.com<br>www.dickblick.com<br>www.markerpop.com<br>www.joann.com | Yes/$6.99 | 12/$83.88<br>36/$251.64<br>72/$503.28 |
| Shinhan Touch brush | www.markerpop.com<br>www.pearlpaint.com | Yes/$6.50 | 12/$78.00<br>24/$156.00<br>36/$234.00<br>48/$312.00<br>72/$390.00 |
| Shinhan Touch fine | www.pearlpaint.com | Yes/$5.50 | 12/$66.00 |
| Kurecolor | www.acmoore.com<br>www.joann.com<br>www.markersupply.com | Yes/$4.46 | 12/$50.00 |
| Pantone | www.dickblick.com | Yes/$4.30 | 12/$51.55<br>24/$103.12<br>36/$156.66<br>72/$309.31 |

These third-party usage of squarish shaped markers and color bands or other methods to indicate color significantly weakens the already weak Copic product configuration marks. *See*, *e.g.*, *Hansen Beverage*, 493 F.3d at 1079 (widely used aggressive graphics and bold accent colors in energy drink market weakened trade dress strength); *E&J Gallo*, 2012 WL 273076, at *16 (existence of numerous trapezoidal-shaped tequila bottles precluded plaintiffs for relying on that element in trade dress claim, despite fact that trapezoidal shaped bottle was an element of

---

[22] The information used in this chart is from selected pages of the websites listed above, and true and correct copies of selected pages of these websites are attached to the Markley Declaration as Exhibits 6, 11, 13, 14, 29, 32, 33.

plaintiffs' registered trade dress); *see also One Indus.*, 578 F.3d at 1164-65 (the use of "O"

marks by three competitors in the industry weakened the conceptually strong "O" mark);

*Newport Pac.*, 2006 WL 2811905, at *12 (significant third-party use of mark caused 'strength'

factor to weigh against likelihood of confusion despite other attributes suggesting strength); *Halo*

*Mgmt. LLC v. Interland, Inc.*, 308 F. Supp. 2d 1019, 1034 (N.D. Cal. 2003) (finding that the term

"halo" is popular in the trademark world and "[a]ny individual user of the 'halo' term thus lacks

significant ability to prevent the use of 'halo' by others in the field"). Thus, the Copic product

configuration marks are weak, and this factor favors the Spectrum Noir Defendants.

### 3. No Evidence of Actual Confusion: This Factor Weighs Against a Likelihood of Confusion.

"Lack of evidence about actual confusion after an ample opportunity for confusion can be

a powerful indication that the junior trademark does not cause a meaningful likelihood of

confusion." *Cohn*, 281 F.3d at 843  (where parties had used the same trademark for six years,

some evidence of actual confusion should be available if any likelihood of confusion existed);

*see also Surfvivor*, 406 F.3d at 633 (when there is only "scant evidence of actual confusion in the

record," the lack of evidence weighs in favor of the accused infringer).

Crafter's Companion first sold the Spectrum Noir markers in approximately September

2011.  Since that time, Crafter's Companion has sold approximately 2,100 sets of 6 the old

Spectrum Noir markers and, in 2012, Crafter's Companion has sold many more sets of 6 and sets

of 24 of the current Spectrum Noir markers in the United States.  (Barbee Decl. ¶ 10.)  The

Spectrum Noir Defendants are not aware of any instances of actual confusion between either the

old or current Spectrum Noir markers.  (*Id.* ¶ 12; Davies Decl. ¶ 7; Jarvey Decl. ¶ 6.)  And

neither are the Copic Plaintiffs.  [Dkt. No. 14 (Copic Plaintiffs' Answer) ¶ 22 (responding that

the Copic Plaintiffs "lack sufficient information to form a belief as to the truth of the

allegation[]" that they are unaware of any evidence of actual confusion as a result of Crafter's

Companions activities).]

The absence of any confusion, despite the numerous sales of the Spectrum Noir markers, heavily favors the Spectrum Noir Defendants and a finding of no likelihood of confusion.

**4.      High Degree of Care Exercised by Purchasers:  This Factor Weighs Against a Likelihood of Confusion.**

   **a.      Professional retail purchasers exercise a high degree of care.**

"In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution." *Sleekcraft*, 599 F.2d at 353.  "When goods are expensive, buyers can be expected to exercise greater care in their purchases, and therefore confusion as to the source of the goods is less likely to occur."  *Moose Creek, Inc. v. Abercrombie & Fitch Co.*, 331 F. Supp. 2d 1214, 1231 (C.D. Cal.) (citing *Sleekcraft*, 599 F.2d at 353), *aff'd*, 114 Fed. Appx. 921 (9th Cir. 2004).  "Moreover, when the relevant customers are professional buyers, they are less likely to be confused by similar marks than are ordinary customers."  *Id.* (citing 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:101 (4th ed. 2004)).  To the extent that marker consumers are wholesalers or retailers, they exercise a high degree of care.  (*See also* Jarvey Decl. ¶ 4.)

   **b.      End consumers also exercise a high degree of care because of the significant difference in price and are unlikely to be confused.**

While the cost of an individual Copic marker, $6.99, and a 6-piece set of Spectrum Noir markers, $11.95, may not be as high as some other retail goods, it is important to recognize the significant difference in price and the effect these price differences have when a consumer purchases additional markers to create a marker collection.  For the price of a set of 6 current Spectrum Noir markers ($11.95), a consumer can purchase only 2 Copic Markers (a total of almost $14.00).  (Barbee Decl., Ex. 1; Markley Decl., Ex. 11.)  A consumer cannot take advantage of the blending aspects of the alcohol markers with only 2 markers, a process that requires 3 markers.  (Barbee Decl. ¶ 7.)  If a consumer wanted to purchase 3 Copic markers, this would cost approximately $21.00.  A consumer could purchase almost 2 sets of 6 current

30- DEFENDANTS' MEMORANDUM IN SUPPORT OF
  MOTION FOR PARTIAL SUMMARY JUDGMENT

Spectrum Noir markers for that price and would have 12 markers and access to 2 different color groups. If a consumer wanted to purchase all 12 of the color groups for the current Spectrum Noir markers (a total of 72 markers), the consumer would spend $143.40. (Barbee Decl., Ex. 1.) To purchase an equivalent amount of Copic markers, a consumer would have to spend $503.28. (Markley Decl., Ex. 11.) A significant difference in price is "likely to make a reasonably prudent consumer relatively more cautious" in buying a product. *Nautilus Grp.*, 427 F. Supp. 2d at 999; *see also Speedry Prod.*, 271 F.2d at 651 (finding that the "wide price differential is also a significant factor" in supporting the conclusion that there was no likelihood of confusion); *Aurora World, Inc. v. Ty Inc.*, 719 F. Supp. 2d 1115 (C.D. Cal. 2009) (finding some degree of care exercised when a consumer purchases a plush toy at a nonneglible cost). Additionally, "except where consumers ordinarily exercise virtually no care in selecting a particular type of product (as may be the case with inexpensive disposable or consumable items), clarity of labeling in packaging and advertising will suffice to preclude almost all possibility of consumer confusion as to source stemming from the product's configuration." *Versa Prod., Co.. v. Bifold Co.*, 50 F.3d 189, 203 (3d Cir. 1995) (internal citations omitted).

Accordingly, this factor weighs against a likelihood of confusion.

### 5.  No Intent to Deceive:  This Factor Weighs Against a Likelihood of Confusion.

Crafter's Companion selected both the old and the current Spectrum Noir marker product configurations because of availability, cost, and functional reasons that are unrelated to the product configuration of the Copic markers. The squarish shaped body was selected because this was the body shape presented by the manufacturer, and it was a reasonable price. Crafter's Companion did not consider a round body shape because it was not presented as an option, and there were not many round marker shapes available. Crafter's Companion kept this body shape because that shape had worked fine on the old Spectrum Noir marker. The functionality of the squarish body shape was obvious because this shape prevents markers from rolling around. The

new hourglass end cap shape was chosen because it gives the user a better grip to remove the end cap.  The color band at the end of marker is used to provide a quick, easy and accurate way to identify the actual color of the marker.  (Davies Decl. ¶¶ 4-6.)

Based on this evidence, no reasonable jury could conclude that Crafter's Companion intended to deceive consumers by trading off any goodwill associated with the Copic marker product configuration.  Thus, this factor favors the Spectrum Noir Defendants and weighs against a likelihood of confusion.  *See One Indus.*, 578 F.3d at 1164; *see also Mattel*, 782 F. Supp. 2d at 1010 (finding no issue of material fact as to defendant's intent when no element of the trade dress other than a trapezoidal shape was shared between the product configuration).

## V.    CONCLUSION

Objective analysis of the *Sleekcraft* factors - especially the dissimilarity between these two markers - weighs decisively against a probability of confusion in this case.  The Court should not give the Copic Plaintiffs a virtual monopoly on a basic geometric squarish body shape in the marker market.  The Spectrum Noir Defendants respectfully requests that the Court grant their motion for summary judgment dismissing the Copic Plaintiffs' claims and granting the Spectrum Noir's motion for summary judgment on their counterclaims for declaratory judgment of non-infringement, all with respect only to the current Spectrum Noir marker.

DATED:  November 21, 2012            **PERKINS COIE LLP**

By: /s/ Julia E. Markley
Stephen F. English, OSB No. 730843
SEnglish@perkinscoie.com
Julia E. Markley, OSB No. 000791
JMarkley@perkinscoie.com
Kristina J. Holm, OSB No. 112607
KJHolm@perkinscoie.com
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Telephone:  503.727.2000
Facsimile:  503.727.2222

Attorneys for Defendants and Counterclaim Plaintiffs
CC International LLC and Hot Off The Press, Inc.

32-  DEFENDANTS' MEMORANDUM IN SUPPORT OF
     MOTION FOR PARTIAL SUMMARY JUDGMENT

## CERTIFICATE OF COMPLIANCE
## PURSUANT TO L.R. 7-2(B)

This brief complies with the applicable word-count limitation under L.R. 7-2(b) because

it contains 9,620 words, including headings, footnotes and quotations, but excluding the caption,

table of contents, table of authorities, signature block and any certificates of counsel.

DATED:  November 21, 2012          **PERKINS COIE** LLP

By: /s/ Julia E. Markley
    Stephen F. English, OSB No. 730843
    SEnglish@perkinscoie.com
    Julia E. Markley, OSB No. 000791
    JMarkley@perkinscoie.com
    Kristina J. Holm, OSB No. 112607
    KJHolm@perkinscoie.com
    1120 N.W. Couch Street, Tenth Floor
    Portland, OR  97209-4128
    Telephone:  503.727.2000
    Facsimile:  503.727.2222

    Attorneys for Defendants and Counterclaim
    Plaintiffs CC International LLC and Hot Off
    The Press, Inc.

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222